AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>A) AN IPHONE MODEL A1429 BEARING IMEI 990002832878993 AND<br>B) A WHITE IPHONE XR, LOCATED AT THE FBI WASHINGTON FIELD<br>OFFICE, 601 4TH ST, NW, WASHINGTON, DC 20535 | )<br>)<br>)<br>)<br>)<br>)    Case No. 20-sw-233 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A incorporated herein.

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C § 1591(a) | Sex Trafficking of Children |
| 18 U.S.C § 1594 | Conspiracy to Commit Sex Trafficking |
| 18 U.S.C § 2423(a) | Transportation of Minors with Intent to Engage in Criminal Sexual Activity |
| 18 U.S.C § 1952 | Interstate Transportation in Aid of Racketeering |
| 18 U.S.C § 2421 | Transportation |

The application is based on these facts:

See attached affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Alix Skelton, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 09/24/2020 _____

_____
*Judge's signature*

City and state: Washington, D.C.

Magistrate Judge Zia Faruqui
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means ☑ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. 20-sw-233 |
| A) AN IPHONE MODEL A1429 BEARING IMEI | ) | |
| 990002832878993 AND B) A WHITE IPHONE XR, LOCATED | ) | |
| AT THE FBI WASHINGTON FIELD OFFICE, 601 4TH ST, | ) | |
| NW, WASHINGTON, DC 20535 | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Columbia
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A incorporated herein.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein.

**YOU ARE COMMANDED** to execute this warrant on or before _____10/07/2020_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ___      Magistrate Judge Zia Faruqui         .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____09/24/2020_____          _____
*Judge's signature*

City and state:  Washington, D.C.                             Magistrate Judge Zia Faruqui
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>20-sw-233 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

*Property to be searched*


The property to be searched is

    A)  an Apple iPhone, model A1429, bearing IMEI 990002832878993; and

    B)  a white iPhone XR with no visible identifiers

previously recovered from a 2013 Chrysler 200 bearing VA tag VFB3077 and located at 3365 V

St NE, Washington, DC.  Both devices are currently located at the FBI Washington Field Office,

601 4th St. NW, Washington, DC, 20535

# ATTACHMENT B

*Property to be seized*

1.      The items, information, and data to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of (1) Title 18, United States Code, Section 1591(a), Sex Trafficking of Children; (2) Title 18, United States Code, Section 1594, Conspiracy to Commit Sex Trafficking; (3) Title 18, United States Code, Section 2423(a) Transportation of Minors with Intent to Engage in Criminal Sexual Activity; (4) Title 18, United States Code, Section 1952, Interstate Transportation in Aid of Racketeering; and (5) Title 18, United States Code, Section 2421, Transportation, as described in the search warrant affidavit, including, but not limited to:

    a.  Any evidence of association with Z.S. or T.H.Y, including but not limited to photographs, videos, letters, or any property belonging to Z.S. or T.H.Y.

    b.  Any evidence of prostitution, including but not limited to photographs or videos of scantily clad or nude females, lingerie, or any advertisements relating to commercial sex.

    c.  Any evidence of child prostitution, including child pornography and child erotica, or any advertisements relating to commercial sex of children.

    d.  Any and all documentation pertaining to any prostitution enterprise,

    e.  Any contractual documents between parties consistent with a "loyalty contract."

    f.  Any and all documentation relating to hotel stays.

    g.  Any and all location information.

    h.  evidence of who used, owned, or controlled the DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing

history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

i. evidence of software that would allow others to control the DEVICES, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

j. evidence of the lack of such malicious software;

k. evidence indicating how and when the DEVICES were accessed or used to determine the chronological context of DEVICES access, use, and events relating to crime under investigation and to the DEVICES's user;

l. evidence indicating the DEVICE user's state of mind as it relates to the crime under investigation;

m. evidence of the attachment to the DEVICES of other storage devices or similar containers for electronic evidence;

n. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the DEVICES;

o. evidence of the times the DEVICES were used;

p. passwords, encryption keys, and other access devices that may be necessary to access the DEVICES;

q. documentation and manuals that may be necessary to access the DEVICES or to conduct a forensic examination of the DEVICES;

r. records of or information about Internet Protocol addresses used by the DEVICES;

s. records of or information about the DEVICES's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

t. contextual information necessary to understand the evidence described in this attachment.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: A) AN IPHONE MODEL A1429 BEARING IMEI 990002832878993 AND B) A WHITE IPHONE XR, LOCATED AT THE FBI WASHINGTON FIELD OFFICE, 601 4ᵀᴴ ST, NW, WASHINGTON, DC 20535 | SW No. 20-sw-233 |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41**
**FOR A WARRANT TO SEARCH AND SEIZE**

I, Special Agent Alix Skelton, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I, Alix Skelton, a Special Agent (SA) with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

2.      I have been employed as a Special Agent of the FBI since December 2011 and am currently assigned to the Washington Field Office, Child Exploitation and Human Trafficking Task Force, at the Northern Virginia Resident Agency. While employed by the FBI, I have investigated federal criminal violations related to cybercrime, child exploitation, child pornography, and human trafficking. I have gained experience through training by the FBI and everyday work relating to conducting these types of investigations. I have also been the Affiant for and participated in the execution of several federal search warrants in human trafficking investigations.

3.      As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

4.      This affidavit is made in support of a search warrant, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, to search A) an Apple iPhone, model A1429, bearing IMEI

990002832878993 and B) a white iPhone XR with no visible identifiers previously seized by the FBI on September 18, 2020, and further described in Attachment A, for the things described in Attachment B, where your affiant believes evidence of violations of (1) Title 18, United States Code, Section 1591(a), Sex Trafficking of Children; (2) Title 18, United States Code, Section 1594, Conspiracy to Commit Sex Trafficking; (3) Title 18, United States Code, Section 2423(a) Transportation of Minors with Intent to Engage in Criminal Sexual Activity; (4) Title 18, United States Code, Section 1952, Interstate Transportation in Aid of Racketeering; and (5) Title 18, United States Code, Section 2421, Transportation.

5.     The statements contained in this affidavit are based upon my investigation, information provided by other law enforcement officers, other personnel specially trained in the seizure and analysis of computers and electronic media, and on my experience and training. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of violations of (1) Title 18, United States Code, Section 1591(a), Sex Trafficking of Children; (2) Title 18, United States Code, Section 1594, Conspiracy to Commit Sex Trafficking; (3) Title 18, United States Code, Section 2423(a) Transportation of Minors with Intent to Engage in Criminal Sexual Activity; (4) Title 18, United States Code, Section 1952, Interstate Transportation in Aid of Racketeering; and (5) Title 18, United States Code, Section 2421, Transportation, exists in the device to be searched.

## PROBABLE CAUSE

6.     On May 14, 2019, the FBI was advised that several juveniles females, who had previously been identified by law enforcement as missing and endangered juveniles, were

2

believed to be advertised online for commercial sex purposes. Specifically, advertisements for Z.S., a fifteen-year-old female, and T.H.Y., a seventeen-year-old female, were located on megapersonals.com and listcrawler.com, two websites known to your affiant to be frequently used for the positing of commercial sex advertisements.

7.    Your affiant viewed multiple advertisements on these websites, as well as advertisements collected by a law enforcement database, which contained photographs of Z.S. and T.H.Y between April 25, 2019 and May 12, 2019 in the Washington, DC and Southern Maryland areas being advertised to engage in commercial sex acts.

8.    As examples, your affiant located the following advertisements:

   a. An advertisement posted on megapersonals.com on April 25, 2019 titled *"Young Sexy and READY"* which contained the text *"Petite Body BIG TITTIES And Nice Booty SS - 60 HH - 120 H - 240 In need of transportation to you for outcalls FaceTime and Phone Call Available For Proof Of Me"*[1] and contained two image files depicting T.H.Y. posed suggestively, including one of her bare breasts. The contact number was listed as 202-823-7009, and the location was Washington, DC.

   b. An advertisement posted on megapersonals.com on April 26, 2019 titled *"Young HOT AND SEXY"* which contained the text, *"Hello I am looking for*

---

[1] In your affiant's training and experience in investigations of this nature, an "outcall" is a commercial sex date in which the commercial sex worker goes to the client's location to engage in the commercial sex date, and an "incall" is a commercial sex date in which the client goes to the commercial sex worker's location to engage in the commercial sex date. References to SS, HH, and H mean rates for "short stay," which generally refers to a 15 minute period of time or shorter, a half hour, and an hour, respectively.

3

generous men interested in Some Grown & Sexy Adult Fun OUTCALLS serious People ONLY ❣ 🎀ust Send pic wanna see me ? go head , you know you wanna call (347) 931-9661" The advertisement contained two image files depicting T.H.Y. and three image files depicting Z.S., both posed suggestively in each image. The contact number listed was 347-931-9661, and the location was listed as Washington, DC.

c.  An advertisement posted on megapersonals.com on April 30, 2019 titled *"2 Lovely Ladies [Incall Only] Waiting To Excite Your Day (SERIOUS INQUIRIES ONLY!)"* which contained the text *"Light skin-(thick juicy titties and pussy is always wet and ready 😋 Brown Skin-(round fat ass, big bouncy titties, shaved pussy)"* and two image files each of Z.S. and T.H.Y. posed suggestively in underwear and lingerie. The contact number on the advertisement was listed as 443-403-7266 and the location was listed as Washington, DC.

d.  An advertisement posted on megapersonals.com on May 1, 2019 titled *"Special Late Night Escapades Come Take A Dive Make You Feel Alive"* which contained the text *"Amazing Light Carmel, Slim Waist, Round Juicy Titties, Super Phat Wet Pussy"* and contained five image files and three video files depicting Z.S. posed suggestively, including one in which depicts her nude body. The contact number on the advertisement was listed as 262-299-6960, and the location was listed as Washington, DC.

e. An advertisement posted on megapersonals.com on May 9, 2019 titled *"Available & Ready To Play Sweetest Sensations, Come Get Your Mind Right"* which contained the text *"☐I'm 21Yrs Young & Very Sexy ♥ ☐My Body Will Amaze You And My Skills Are Out Of This World ♥ ☐My Touch Will Soothe Your Every Need ♥ ☐Ready For Your Company NIGHT ♥ OPEN MINDED & LOVE TO PLAY★SKIN SO SOFT YOU WILL KEEP COMING FOR MORE! ●Independent☐ ●Very Discreet☐ ●Respectful☐ ●NO RUSH!!☐ ●Very Friendly My services charge as below : Ss➡80 Hhr➡120 Hr➡200 6 Hrs➡850 I Love What I Do & I Want To Have A Nice Time With You CALL OR TEXT NOW 2408170418."* The advertisement contained five image files and two video files of Z.S. posed suggestively in underwear, and at least one image depicted her nude breasts. The contact number on the advertisement was listed as 240-817-0418, and the location was listed as Washington, DC.

### Z.S.'s STATEMENT

9.      On May 16, 2019, law enforcement located Z.S. in a hotel room at the Motel 6, located at 5701 Allentown Rd, Camp Spring, Maryland.  She was in the company of an adult

male, Gregory Lucas. At that time, Z.S. advised law enforcement that she had used Lucas's cell phone to access a TextNow[2] account associated with her commercial sex advertisements.

10.     Lucas voluntarily provided his cell phone to law enforcement and gave your affiant consent to search the device. Your affiant conducted a forensic analysis of the device and located a TextNow account associated with telephone number 262-299-6960, the number in one of the advertisements described above. Additionally, text messages to and from this account were recovered, some of which had been deleted. Based on your affiant's training and experience, many of these messages were consistent with arranging commercial sex dates. Several deleted messages to and from telephone number 301-266-3111, which was stored with the associated contact name "Kash," were recovered, including one dated May 10, 2019 in which the user of 262-299-6960 stated "get condoms."

11.     On May 17, and June 28, 2019, your affiant interviewed Z.S. During the interviews, Z.S. stated the following:

12.     **FOWLER.** Since the date she and T.H.Y. left a residential placement facility in Virginia (known to law enforcement to have occurred on April 21, 2019), she and T.HY. engaged in commercial sex with multiple men in Virginia, the District of Columbia, and Maryland. Specifically, several days after leaving the residential placement facility, she and T.H.Y. met an adult male in the District of Columbia known to her as "Chucky," later identified as CURTIS LAKEITH FOWLER (hereinafter "FOWLER"). FOWLER advised Z.S. and T.H.Y.

---

[2] "TextNow" is a mobile messaging application that allows users to send text messages from an assigned phone number that is created within the application and is not associated with a particular mobile device.

that he could "help them make money." Z.S. advised that she knew this to mean that FOWLER would have them engage commercial sex.

13.     That first day they met, FOWLER posted advertisements for Z.S. and T.H.Y. for commercial sex online, however, neither Z.S. nor T.H.Y. engaged in any commercial sex dates that day.[3]

14.     **JONES.**  The following day, FOWLER introduced Z.S. and T.H.Y. to an adult female known to Z.S. as "Brittany," "B," or "Bossy B," later identified as JONES, who was going to assist them in securing commercial sex dates. JONES brought Z.S., T.H.Y., FOWLER, and FOWLER's girlfriend, known to Z.S. as "Diamond," to "Diamond's" residence for the night. That night, JONES and "Diamond" took photographs of Z.S. and T.H.Y. in underwear and lingerie provided by JONES for use in advertisements for commercial sex.

15.     **LEWIS and TAYLOR.**  The following day, JONES and two other individuals, one known to Z.S. as "Kashh," later identified as ASHLEY LAUREN BRIAUNA TAYLOR (hereinafter "TAYLOR") and "P," later identified as WILLIS PIERRE LEWIS (hereinafter "LEWIS"), picked Z.S. and T.H.Y. up from the residence and drove them to a location in Maryland. On that date, LEWIS and TAYLOR advised Z.S. and T.H.Y. that they were going to work in a commercial sex business with LEWIS and TAYLOR.  LEWIS and TAYLOR provided Z.S. and T.H.Y. with loyalty contracts to sign. Z.S. and T.H.Y. did sign the contracts, though neither wanted to do so. Further, LEWIS and TAYLOR advised Z.S. and T.H.Y. that 30% of the money made by Z.S. and T.H.Y. would go to LEWIS and TAYLOR.

---

[3] Subsequent investigation by the FBI located the advertisement described by Z.S.  It was posted in the District of Columbia and included FOWLER's telephone number as the contact number and a picture of T.H.Y.

16.     Also on that date, JONES drove Z.S. and T.H.Y. in JONES' car, which Z.S. described as being grey in color, and having a broken rear window covered in plastic, from the location in Maryland at which Z.S. and T.H.Y. had signed the loyalty contracts to a commercial sex date.  However, Z.S. reported that she did not engage in commercial sex with the customer because the customer did not want to pay before engaging in the planned sexual activity.

17.     Beginning on that date, TAYLOR began to post commercial sex advertisements for Z.S. and T.H.Y using TAYLOR's cell phone. TAYLOR used a TextNow telephone number for the advertisements. This TextNow account was installed on TAYLOR's phone, and later, also on a phone used by Z.S. Communications with potential commercial sex customers were handled primarily by TAYLOR, but Z.S. sometimes communicated with them directly via TextNow text message.

18.     LEWIS drove Z.S. and T.H.Y. in his green Cadillac to outcall commercial sex dates and to various apartments and hotels in which Z.S. and T.H.Y. engaged in commercial sex dates arranged as a result of the online advertisements and the like.  According to Z.S., LEWIS's car had "rims" and a sunroof. Z.S. reported that LEWIS carried a handgun with him in a black backpack that he always had with him. If LEWIS was not around, TAYLOR held the gun.

19.     **BARTON.**  As a result of these advertisements, both Z.S. and T.H.Y. engaged in commercial sex dates with various men in residences and hotels in the District of Columbia and Maryland. Specifically, LEWIS and TAYLOR took Z.S. and T.H.Y. to an apartment located at 1414 Southview Drive, Apartment 313 in Oxon Hill, Maryland, which belonged to a man known to Z.S. as "Rico," later identified as RODRICK MCGRIER BARTON (hereinafter "BARTON"). In order to access the building, Z.S. recalled that she needed to enter the code #313 on a key pad, so BARTON could remotely unlock the door. BARTON's apartment is on the third floor of the

8

building. BARTON made his apartment available for Z.S. and T.H.Y. to use for commercial sex dates in exchange for $80 per night. Z.S. and T.H.Y. spent one night and BARTON's apartment and Z.S. had approximately three commercial sex dates at this residence.

20.      Additionally, after having an opportunity to observe Z.S. and T.H.Y., BARTON engaged in oral and vaginal sexual intercourse with both Z.S. and T.H.Y. in the residence and recorded the encounter on his cell phone. The recording was sent to TAYLOR's cellphone on the same date, where Z.S. observed the video thumbnail.

21.      On the night that Z.S. and T.H.Y. stayed at BARTON's apartment, LEWIS drove both Z.S. and T.H.Y., as well as TAYLOR, and BARTON to a party so that Z.S. and T.H.Y. could engage in commercial sex. Z.S. had one commercial sex date in a bedroom at the apartment in which the party was hosted. Z.S. gave a portion of the money she made on this date to TAYLOR and LEWIS.

22.      Z.S. further advised that several days after beginning work for TAYLOR and LEWIS, T.H.Y. said she was leaving. In fact, T.H.Y. did leave and Z.S. has not seen her since. Z.S. continued to work in commercial sex for the benefit of TAYLOR and LEWIS, including at the Motel 6 where she was recovered by law enforcement, for approximately one week after T.H.Y. left the group. Z.S. provided some of the money she earned during the commercial sex dates to TAYLOR, and Z.S. observed TAYLOR in turn provide the money to LEWIS.

23.      Eventually, Z.S. decided that she was going to leave TAYLOR and LEWIS, and she did so. Upon telling them she was leaving, TAYLOR took all the money that Z.S. possessed. All of the money that Z.S. possessed had been earned by engaging in commercial sex.

24.      Z.S. has identified a photograph of LEWIS as the individual she knows as "P," a photograph of TAYLOR as the individual she knows as "Kashh," a photograph of JONES as the

individual she knows as "Brittany," a photograph of FOWLER as the individual she knows as "Chucky," and a photograph of BARTON as the individual she knows as "Rico." She has also identified a photograph of a green Cadillac located on a Facebook page associated with LEWIS as the vehicle in which LEWIS drove her and T.H.Y. to engage in commercial sex dates. She has also identified the residence located at 5100 Brookside Court, Oxon Hill, MD as LEWIS's residence which she knows he shares with his wife Ronda (later identified as RONDA D. MANNS), the apartment complex that includes 74 Galveston Street SW, Washington, DC, as the complex in which FOWLER resides, and the apartment building located at 1414 South View Drive, Oxon Hill, MD, as the building in which BARTON resides.

## **T.H.Y.'s STATEMENT**

25.     On May 16, 2019, your affiant was advised that T.H.Y. was currently located at a juvenile detention facility in California. On May 29, 2019, your affiant interviewed T.H.Y. at the juvenile detention facility in California.  During the interview, T.H.Y. stated the following:

26.     **FOWLER.**  T.H.Y. reported that she had met Z.S. at a residential placement facility in Virginia.  She stated that the two had left the residential placement facility with three other minor females.  T.H.Y. disclosed that she and Z.S. were brought into the District of Columbia a couple days later by a taxicab driver that the two had met after they ran away from the residential placement facility.  After the two spent some time walking around in the District of Columbia, they met FOWLER (known to her as "Chucky") who advised he would "help them make money."

27.     While with FOWLER, FOWLER told T.H.Y. to post commercial sex advertisements on megapersonals.com. T.H.Y. did post such advertisements using FOWLER's

cell phone, and included FOWLER's cell phone number as the contact for the advertisement.[4] Several people called FOWLER attempting to set up commercial sex dates, but T.H.Y. did not do any dates based on those advertisements with FOWLER.

28.     **JONES.**  FOWLER introduced Z.S. and T.H.Y. to two females, JONES (known to her as "B," "Brick," or "Boss") and "Diamond," whom FOLWER told them would help them to make money. T.H.Y. understood this to mean working performing commercial sex dates. JONES drove FOWLER, "Diamond," T.H.Y. and Z.S. to "Diamond's" townhouse, where "Diamond" and FOWLER took photos of T.H.Y. and Z.S. and posted commercial sex advertisements for them.

29.     **LEWIS and TAYLOR.**  T.H.Y. further advised that the next day, JONES introduced her and Z.S. to TAYLOR and LEWIS for the purpose of working in a commercial sex business. T.H.Y. stated that both she and Z.S. signed loyalty contracts, though she did not want to do so. By that time, however, T.H.Y. felt as though she had no choice but to do so.  TAYLOR and LEWIS told T.H.Y. and Z.S. that they would be required to give 30% of money made engaging in commercial sex to TAYLOR and LEWIS.  This occurred while the girls were in LEWIS's vehicle parked on the street.

30.     On that date, JONES drove T.H.Y. and Z.S. in her vehicle, which T.H.Y. described as a grey Chrysler 200 with a broken back window covered in plastic, for the purpose of Z.S. engaging in a commercial sex date. The address for the date had been provided to JONES by TAYLOR. T.H.Y. said that, upon their arrival at the location of the commercial sex date, they saw a man known to JONES, who she referred to as "Ralphie." Z.S. left the vehicle with the

---

[4] The advertisement is the one described in paragraph 7(a) above.

potential commercial sex customer, however, he wanted to engage in sexual activity with Z.S. prior to providing her money for those services. Z.S. refused to engage in sexual activity prior to being paid, and returned having not engaged in the date nor having been paid.  T.H.Y. reported that JONES was very upset and wanted to fight the customer.  JONES, T.H.Y., and Z.S. eventually left and returned to their starting location in either Washington, DC or Maryland, T.H.Y. was unsure which.[5]

31.    TAYLOR took photographs of T.H.Y. and Z.S., which she posted on megapersonals.com as part of advertisements for commercial sex. T.H.Y. reported that communications with potential commercial sex customers were handled by TAYLOR, on her two cell phones, for the arrangement of commercial sex dates.

32.    For the next several days, T.H.Y. and Z.S. engaged in commercial sex with men in Maryland and Washington, D.C. in residences and hotels to include a Motel 6 in Camp Spring, Maryland, and an Econolodge in Hamilton, MD. After the dates, TAYLOR told T.H.Y. how much 30% of what she earned totaled, and T.H.Y. gave this amount to TAYLOR.   T.H.Y. reported that on a number of occasions, the amount of the money that TAYLOR took from her was much greater than 30%.  T.H.Y reported that when commercial sex dates were scheduled, LEWIS drove them to the hotels and residences in his green Cadillac.  T.H.Y. stated that TAYLOR and LEWIS carried a handgun with them in a black backpack at all times.

_____

[5] Based on Z.S.'s description of the location, FBI determined that the location was near LEWIS's residence in Oxon Hill, Maryland.  Specifically, Z.S. told the FBI that the location was "around the corner" from the house she identified as LEWIS's in a photo.   FBI showed T.H.Y. photographs of the area and T.H.Y. was able to point out an area where LEWIS had parked on the street, which was near his residence.

33.    **BARTON.**  T.H.Y reported that on one occasion, LEWIS and TAYLOR drove T.H.Y. and Z.S. to BARTON's apartment so that T.H.Y. and Z.S. could engage in commercial sex incalls, for which BARTON charged them $80 per night.  T.H.Y. reported that BARTON's apartment building requires a code to access the front door, and BARTON's apartment is on the third floor. On the day they arrived at the apartment, T.H.Y. and Z.S. engaged in a "threesome" with BARTON, which included vaginal and oral intercourse. Both BARTON and TAYLOR filmed the sexual encounter using BARTON's cell phone. BARTON advised that he was going to sell the video to make money. BARTON also sent the video to TAYLOR's cell phone, where T.H.Y. watched it. T.H.Y. believes the video was transferred via TextNow.

34.    On that same night, BARTON arranged for T.H.Y. and Z.S. to work at a party in the District of Columbia.  LEWIS drove TAYLOR, BARTON, T.H.Y., and Z.S. to the party where Z.S. did, in fact, engage in a commercial sex date. T.H.Y. did not do any commercial sex dates while at the party. When they left the party, they all returned to BARTON's apartment and spent the night. TAYLOR required that T.H.Y. stay up all night and continue to answer text messages from potential commercial sex clients using TAYLOR's cell phone. The following day, T.H.Y. and Z.S. engaged in approximately three commercial sex dates each at BARTON's apartment. T.H.Y. made $280 during her three dates, and TAYLOR took over $100 of that money from T.H.Y.

35.    LEWIS, TAYLOR, T.H.Y. and Z.S. left BARTON's apartment later that day and went to the Econolodge in Clinton, MD. While at the Econolodge, T.H.Y. had approximately eight commercial sex dates and made approximately $400. TAYLOR took about $200 of this money. T.H.Y. and Z.S. engaged in a "two girl special" during an outcall to a customer's apartment. TAYLOR and LEWIS drove T.H.Y. and Z.S. to the date, and both T.H.Y. and Z.S.

13

engaged in intercourse with the customer for $140. The customer gave them a $20 tip, which neither T.H.Y. nor Z.S. told LEWIS and TAYLOR about so that they could keep the extra money.

36.     On May 3, 2019, T.H.Y. advised TAYLOR and LEWIS that she was leaving. T.H.Y. used all the money she had to buy a Greyhound bus ticket to Sacramento, CA. On May 8, 2019, T.H.Y. boarded a Greyhound bus which took her to Sacramento, CA on or about May 12, 2019, where she turned herself in to a juvenile receiving center before needing to be hospitalized.

37.     T.H.Y. identified a photograph of LEWIS as the individual she knows as "P," and a photograph of TAYLOR as the individual she knows as "Kashh." She has also identified a photograph of a green Cadillac located on a Facebook page (www.Facebook.com/willis.lewis.568) associated with LEWIS as the vehicle in which LEWIS had driven her and Z.S. for commercial sex dates.   T.H.Y. identified a photograph of the Motel 6 located at 5701 Allentown Rd, Camp Springs, MD, and the Econolodge located at 7851 Malcolm Rd, Clinton, MD, as motels at which both she and Z.S. worked in commercial sex for the financial benefit of TAYLOR and LEWIS.[6]

38.     On July 11, 2019, T.H.Y. was again interviewed by law enforcement in the District of Columbia.   T.H.Y. was asked additional, more detailed questions about her interactions with TAYLOR and LEWIS, among other things.   During the course of this second interview, T.H.Y. described in even greater detail her fear of TAYLOR and LEWIS, stating that

---

[6] At the time of T.H.Y.'s initial interview, the FBI had not yet identified JONES, FOWLER, or BARTON.  When T.H.Y. was interviewed again on July 11, 2019, as set forth below, FBI had identified them, and T.H.Y. was shown a confirmation photo of each, resulting in a positive identification of each.

the two carried a gun in a black backpack and used it to threaten and intimidate T.H.Y. and Z.S. Specifically, T.H.Y. stated that on one occasion, while TAYLOR and LEWIS were staying at a motel in Maryland with T.H.Y. and Z.S., where they were required to perform commercial sex dates, TAYLOR became angry with T.H.Y. and Z.S. for the path they walked when returning to the motel room from a vending machine. T.H.Y. stated that once back inside the room, TAYLOR pulled out the gun and began "waving" it at T.H.Y. and Z.S. and yelling at them for their failure to follow directions. LEWIS stood by pacing the room while TAYLOR reprimanded the girls and threatened them with the gun.  T.H.Y. reported that she was in fear for her life during the encounter.  T.H.Y. reported that on another occasion, she woke up to find that TAYLOR and LEWIS had placed the gun under her pillow, which, too, made her afraid.

39.     During this follow-up interview, T.H.Y. was also shown advertisements that had been posted on Megapersonals.com by FOWLER and JONES and identified the advertisements as depicting her and Z.S.  These are the advertisements described in paragraphs 7(a) and 7(b) above. T.H.Y. also identified a photograph of JONES as the individual she knows as "Bricks," a photograph of FOWLER as the individual she knows as "Chucky," and a photograph of BARTON as the individual she knows as "Rico."  Finally, T.H.Y. identified a photograph of 5100 Brookside Court, Oxon Hill, MD as LEWIS's residence, and a photograph of 1414 Southview Drive, Oxon Hill, MD as BARTON's building

## FURTHER INVESTIGATION

40.     On June 3, 2019, the Econolodge located at 7851 Malcolm Rd, in Clinton, MD voluntarily provided guest registration information to your affiant for April 28, 2019 and April 30, 2019.  On those dates, rooms were rented for one and two nights, respectively, in the name

Willis Lewis. Additionally, your affiant received a photocopy of LEWIS's Maryland ID card, which he had provided and that was scanned at the time of check-in for each reservation.

41.     On June 3, 2019, the Motel 6 located at 5701 Allentown Rd, in Camp Springs, MD voluntarily provided guest registration information to your affiant that showed that on May 2, 2019 and May 4, 2019, rooms were rented for one night each in the name Willis Lewis, with a listed address of 906 Minna Ave, Capitol Heights, MD. Motel 6 advised that it does not maintain photocopies of identification cards, but guests are required to scan their identification cards and the information automatically populates into the system with the name and address on the identification. Your affiant is aware from the identification card provided by Econolodge, and referenced above, that LEWIS's Maryland identification card contains the address 906 Minna Ave, Capitol Heights, MD.

42.     A query of the Virginia Department of Motor Vehicle database revealed a grey 2013 Chrysler 200, bearing VA tag VFB3077 and Vehicle Identification Number 1C3CCBAB1DN691830, registered jointly to Lisa Yvonne Webster and JONES.

43.     A query of a law enforcement database containing license plate reader information in the District of Columbia located images of the grey Chrysler 200 bearing Virginia tag VFB3077 registered to JONES. Specifically, the images of the vehicle recorded on May 7, 13, 17, and 22, 2019 show a plastic bag covering the rear passenger side window of the vehicle - as described by Z.S. and T.H.Y.

44.     On June 5, 2019, your affiant located an Instagram page containing the vanity name "brickie_banz" which contained profile pictures depicting JONES. On the same date, an administrative subpoena was served on Instagram for subscriber records relating to this account. In response to the subpoena, Instagram provided records indicating that the account had an

16

associated verified telephone number of 202-760-7985 and an associated email address of bossyhoncho@gmail.com. As noted below, that email account and phone number were used in connection with the offenses under investigation.

45.     On June 6, 2019, Megapersonals.com voluntarily provided your affiant with records related to the advertisements referenced in paragraph 3, above. Specifically, the email address associated with account used to post the April 26 advertisement, containing telephone number 347-931-9661, is bossyhoncho@gmail.com. Also included in the Megapersonals.com records were records indicating that the advertisement depicting Z.S. and referenced in subparagraph 7(e), above, was accessed by its creator on May 3, 2019 at 7:51am from IP address 173.79.141.8.

46.     On May 31, 2019 an administrative subpoena was served on Verizon Fios for subscriber information related to IP address 173.79.141.8 at 7:51am on May 3, 2019. Records responsive to this request indicate that, at the date and time it was used to access the Megapersonals.com advertisement depicting Z.S., this IP address was assigned to Marquis Manns with a services address at 5100 Brookside Court, Oxon Hill, MD, that is, LEWIS's residence shared with his wife MANNS.

47.     On June 7, 2019, an administrative subpoena was served on Google for subscriber information related to the email address bossyhoncho@gmail.com. Records responsive to this request indicate that subscriber name is "Boss Jones," the associated telephone number is 202-760-7985, and the recovery email addresses are msbrittanyajones@gmail.com and Brittany_jones0689@yahoo.com.

48.     On June 6, 2019 and June 20, 2019, search warrants were authorized by the Hon. Robin M. Meriweather, United States Magistrate Judge for the District of Columbia, for text

17

message content and subscriber information related to telephone numbers 240-817-0418, 262-299-6960, 443-403-7266 and 347-931-9661 stored by TextNow.

49.     On June 11, 2019 and June 24, 2019, TextNow provided your affiant with records responsive to these requests. Subscriber information for 347-931-9661 includes an associated email address of bossyhoncho@gmail.com. The user of this account repeatedly identifies herself as "Bricks," "Bee," and "Brittany" to multiple other individuals via text message. Subscriber information for 443-403-7266 includes the user name lovely.ashh, a date of birth of 10/1/1992, and the associated email address of taylor_ashley15@yahoo.com.  The user of this account also repeatedly identifies herself as "Kashh" and "Ash" to other individuals via text message.

50.     Each of the four TextNow telephone numbers engaged in text message conversations with individuals arranging commercial sex dates between April 27 and May 11, 2019, including those which appear to specifically reference the advertisements discussed in paragraph 3, above, and others depicting Z.S. and T.H.Y.

51.     Specifically, on April 27, 2019, the following conversation occurred between TAYLOR utilizing 443-403-7266 and JONES utilizing telephone number 202-760-7985:

> *TAYLOR:* Call Ralph When You Get There He Gon Come To You And Lookout[7]
> *JONES:* Aite
> *JONES:* U made sure he not affiliated right?[8]
> *TAYLOR:* How Close Are Yall??
> *TAYLOR:* Yeah
> *JONES:* Aite 3 min

---

[7] All text abbreviations and typographical errors contained in quoted text language are original.

[8] Your affiant is aware that "affiliated" means affiliated with law enforcement.

*TAYLOR:* Kool

*TAYLOR:* Tell Her He Wanna Eat Her 140

*TAYLOR:* He Got A Orange Long Sleeve On

*TAYLOR:* Where Yall At??

*TAYLOR:* Wtf Bruh

*TAYLOR:* Yall Good

*JONES:* Yea

*TAYLOR:* Hit me when yall otw back so i can reserve the room

*JONES:* Tell P[9] I need a dog[10] when we go on these moves[11]

*TAYLOR:* Sharp

*TAYLOR:* She Done Yet??

*JONES:* This nigga was in games I just wasted my fucking meal money for this dumb shit

*JONES:* We it's back

*TAYLOR:* Kk


52.     On May 4, 2019 the following conversation occurred between Z.S. utilizing 262-299-6960 and telephone number 301-266-3111:

**Z.S.:** Can I get some sleep its 6:33

**Z.S.:** Ok

**301-266-3111:** Naw You Slept All Day And Didnt Work All Night..

**301-266-3111:** You Done?

**301-266-3111:** Ok What?

**Z.S.:** Um well I'm not finna be wprking all day and night wtf

---

[9] Your affiant is aware that LEWIS's often uses the nickname "P."

[10] Your affiant is aware that "dog" is a slang expression for a gun.

[11] Your affiant is aware that a "move" is a slang expression for a commercial sex date.

**Z.S.:** Here

**301-266-3111:** [:ok_hand: emoji]

**301-266-3111:** One Otw

*[Z.S. receives a missed call from 301-266-3111 stored in contacts as "Kash"]*

**Z.S.:** Done

**Z.S.:** Here

**Z.S.:** He sending it on cashapp now

**301-266-3111:** Kool

*[Z.S. receives a missed call from 301-266-3111 stored in contacts as "Kash"]*

**Z.S.:** Hes here im going to sleep after

**301-266-3111:** [:ok_hand: emoji]

**Z.S.:** He's done

**301-266-3111:** [:ok_hand: emoji] Get Some Rest Babygirl

**301-266-3111:** Keep This Same Routine And You Could Easily Buss Em With 10 Moves A Day!!

**Z.S.:** Ok

**Z.S.:** He left cuz ion got no condom but he gone get spme n come back

*[Z.S. receives a missed call from 301-266-3111 stored in contacts as "Kash"]*

**Z.S.:** Done


53.     Also, at approximately 11:37pm EST on April 29, 2019, the evening that LEWIS drove Z.S., T.H.Y., TAYLOR, and BARTON from 1414 South View Drive, Oxon Hill, Maryland (BARTON's apartment, where Z.S. had commercial sex dates) to a party in the District of Columbia for the purpose of Z.S. and T.H.Y. engaging in commercial sex dates, the user of the TextNow number 262-299-6960 began a text message conversation with an unknown individual appearing to arrange a commercial sex date. The other individual requested an address and at 11:45pm EST, 262-299-6960 stated "1300 Park Road NW."

54.     On 17 occasions between March 28 and May 13, 2019, JONES, utilizing 347-931-9661 to communicate with other users, provided her additional telephone number as 202-760-7985. Additionally, records provided by TextNow indicate that, on May 11, 2019, telephone number 443-403-7266 had a missed a phone call from a contact saved as "Brick City" from telephone number 202-760-7985.

55.     On July 8, 2019, a search warrant for T-Mobile was authorized by the Hon. Deborah A. Robinson, United States Magistrate Judge for the District of Columbia, for subscriber information, historical cell site data, a pen register/trap and trace, and prospective GPS tracking related to telephone number 202-760-7985. Records responsive to this request identified the subscriber of 202-760-7985 as "Brittany Jones," from December 5, 2018 through the date of the search warrant.

56.     On July 26, 2019, multiple residential search and seizure warrants were authorized by the Hon. Timothy J Sullivan, United States Magistrate Judge for the District of Maryland, for residences and vehicles. Specifically, a warrant was authorized for the search and seizure of the 2013 Chrysler 200, bearing VA tag VFB3077, which was registered jointly to Lisa Yvonne Webster and JONES and operated by JONES as well as for the forensic examinations of electronic devices located therein.

57.     Also on July 26, 2019, arrest warrants were authorized by the Hon. Deborah A. Robinson, United States Magistrate Judge for the District of Columbia charging JONES, FOWLER, LEWIS, TAYLOR, and BARTON with various offenses involving the sex trafficking of Z.S. and T.H.Y. in the District of Columbia and elsewhere.

58.     JONES was located and arrested in a third party residence in Camp Springs, Maryland, on July 30, 2019. Immediately following JONES' arrest, a consent search authorized

by the resident of the third party residence in which JONES was arrested, located an iPhone 6S which was identified as belonging to JONES. The referenced Chrysler 200 was also located parked outside the third party residence.

59.     On July 30, 2019, subsequent to her arrest, JONES was interviewed by FBI Special Agent Emily Eckert and Task Force Officer Jeremiah Johnson. JONES was advised of her rights pursuant to *Miranda*, agreed to waive those rights, and voluntarily agreed to speak with Agents. During her interview, JONES advised Agents that she had only possessed her current cell phone since approximately her June 30, when her previous cell phone was stolen.

60.     Also on July 30, 2019, simultaneous to JONES's arrest, the search and seizure warrant for the referenced Chrysler was executed by FBI Special Agents Seunghyun Eom and Brian Thomas. Several items of evidence were located and seized from within the Chrysler 200, including two cell phones. Non-evidentiary items located inside the vehicle were left inside the vehicle.

61.     On September 4, 2019, the Hon. Robin M. Meriweather, United States Magistrate Judge for the District of Columbia, authorized a search warrant for JONES' iPhone. A forensic examination of the phone was subsequently conducted pursuant to that search warrant. Attribution evidence located on the device confirmed that the phone belonged to JONES and also confirmed that the phone appeared to have been activated in late June 2019.

62.     Forensic examinations of the two cell phones located in the Chrysler 200, pursuant to the above referenced search warrant authorized in the District of Maryland on July 26, 2019, were also conducted. Analysis of these devices was unable to confirm that either of these cell phones were the devices used by JONES during the time of her involvement in the sex trafficking of T.H.Y. and Z.S..

22

63.     The Chrysler 200, including its contents, has been maintained as a seized item of evidence at a secure FBI facility located at 3365 V St NE, Washington, DC since its seizure, and it is currently located there. Any personal items inside the vehicle, therefore, were present in the vehicle at the time of its seizure on July 30, 2019.

64.     On September 18, 2020, with the consent of JONES' defense attorney, Ernest McIntosh, your Affiant conducted an inventory search of the Chrysler 200 in an effort to remove JONES' non-evidentiary personal property in order to return these items to JONES' designee. During the inventory search, your Affiant located two cell phones (collectively the DEVICES): a damaged iPhone model A1429 located inside the center console of the vehicle and an iPhone XR located inside a backpack located in the trunk of the vehicle.

65.     Your affiant seized the DEVICES at the time they were located and entered them as items of evidence. The DEVICES have been maintained pursuant to FBI evidence policy since their seizure and are currently located at the FBI Washington Field Office, 601 4th St. NW, Washington, DC, 20535.

66.     In my training and experience, I know that the DEVICES have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the DEVICES first came into the possession of law enforcement.

**TECHNICAL TERMS**

67.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

23

1)  A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.  *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)  "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)  "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

24

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives

25

signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

e.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

f.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

h.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

i.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

j.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant

27

client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

k.     "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

l.     "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

m.     "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended

28

network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

n.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

o.      Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense(s) under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

68.      As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the DEVICES, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is

probable cause to believe that the records and information described in Attachment B will be stored in the DEVICES for at least the following reasons:

      a.     Individuals who engage in criminal activity, including violations of 18 United States Code, Sections 1591(a); 1594(c); 2423(a); and 2421 use digital devices, like the DEVICES, to access websites to facilitate illegal activity (for example, the posting of commercial sex advertisements) and to communicate with victims, witnesses, potential customers, and co-conspirators online; to store on digital devices, like the DEVICES, documents, photographs, recordings, messages, and other records relating to their illegal activity, which can include logs of online chats; email correspondence and correspondence through other applications; text or other "Short Message Service" ("SMS") messages; contact information of victims, witnesses, commercial sex customers, and other co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; names, addresses, telephone numbers, and social security numbers of other individuals; records of internet searches and Web History browsers; I.P. addresses; and other means used in furtherance of these crimes as stated above, incorporated by reference here.

      b.     Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

      c.     Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years

later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

69.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital DEVICES were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in the DEVICES at issue here because:

31

a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data stored in the DEVICES, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

32

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

33

f.       I know that when an individual uses a digital device to coerce another individual into engaging in sexual activity, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## **METHODS TO BE USED TO SEARCH DIGITAL DEVICES**

70.       Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.       Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that

34

are being searched, and to obtain specialized hardware and software solutions to meet the needs
of a particular forensic analysis.

       b.     Digital data is particularly vulnerable to inadvertent or intentional
modification or destruction.  Searching digital devices can require the use of precise, scientific
procedures that are designed to maintain the integrity of digital data and to recover "hidden,"
erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic
files from digital devices also requires specialized tools and often substantial time.  As a result, a
controlled environment, such as a law enforcement laboratory or similar facility, is often
essential to conducting a complete and accurate analysis of data stored on digital devices.

       c.     Further, as discussed above, evidence of how a digital device has been
used, the purposes for which it has been used, and who has used it, may be reflected in the
absence of particular data on a digital device.  For example, to rebut a claim that the owner of a
digital device was not responsible for a particular use because the device was being controlled
remotely by malicious software, it may be necessary to show that malicious software that allows
someone else to control the digital device remotely is not present on the digital device.  Evidence
of the absence of particular data or software on a digital device is not segregable from the digital
device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular
data or software requires specialized tools and a controlled laboratory environment, and can
require substantial time.

       d.     Digital device users can attempt to conceal data within digital devices
through a number of methods, including the use of innocuous or misleading filenames and
extensions.  For example, files with the extension ".jpg" often are image files; however, a user
can easily change the extension to ".txt" to conceal the image and make it appear that the file

contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

    e.  Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before

examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

   f. Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

71.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.      The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.      The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.      In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the

38

Device(s) will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

72.     Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## CONCLUSION

73.     Based upon the above information, I believe that probable cause exists to believe there have been violations of (1) Title 18, United States Code, Section 1591(a), Sex Trafficking of Children; (2) Title 18, United States Code, Section 1594, Conspiracy to Commit Sex Trafficking; (3) Title 18, United States Code, Section 2423(a) Transportation of Minors with Intent to Engage in Criminal Sexual Activity; (4) Title 18, United States Code, Section 1952, Interstate Transportation in Aid of Racketeering; and (5) Title 18, United States Code, Section 2421, Transportation, and that there is probable cause to believe that evidence, fruits, or instrumentalities of such offenses, exist within the Apple iPhone, model A1429, bearing IMEI 990002832878993 and the white iPhone XR with no visible identifiers previously seized by the FBI on September 18, 2020, and further described in Attachment A, for the things described in Attachment B.

74.     In consideration of the foregoing, I respectfully request that this Court issue a search warrant for A) an Apple iPhone, model A1429, bearing IMEI 990002832878993 and B) a white iPhone XR with no visible identifiers previously seized by the FBI on September 18, 2020, and further described in Attachment A, for the things described in Attachment B.

Respectfully submitted,

Special Agent Alix Skelton
FBI

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on September _____, 2020.

UNITED STATES MAGISTRATE JUDGE

ZIA FARUQUI

40